**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CRYSTAL G. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 11-cv-7905 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| INLAND SBA MANAGEMENT | ) | |
| CORPORATION, an Illinois corporation, and | ) | |
| SOMERCOR 504, INC., an Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Crystal Howard worked at SomerCor 504, Inc. ("SomerCor") from March 2004 until September 2009. Plaintiff alleges that the company passed her over for a promotion because of her race and gender and that her boss sexually harassed her for more than two years. She further alleges that in retaliation for her complaints about the discrimination and harassment, the company demoted her, created a hostile work environment, and ultimately terminated her employment. Because Plaintiff technically was employed by Inland SBA Management Corporation ("Inland"), which provided SomerCor with its employees, Plaintiff has sued both companies for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Before the Court are motions for summary judgment [62, 73], filed by Defendants SomerCor and Inland, respectively, which argue that Plaintiff has presented no genuine issue of material fact as to any Count and that Defendants are entitled to judgment as a matter of law. For the reasons stated below, the Court grants in part and denies in part Defendants' motions for summary judgment [62, 73].

# I.   Background

## A.   Statement of Facts

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements.   Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law.   The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts.   L.R. 56.1(a)(3).   Both SomerCor and Inland have complied with this requirement of the Rule.   The Rule also requires the non-movant (here, Plaintiff) to file a concise response to a movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials."   L.R. 56.1(b)(3)(A).   Plaintiff has done that.

Regrettably, however, Plaintiff has not fully complied with other aspects of Local Rule 56.1.   To begin with, Plaintiff has not adhered to the Rule's directive that she submit her own statement of up to 40 additional facts if Plaintiff wishes the Court to consider facts in addition to those set forth in the movants' statements.   L.R. 56.1(b)(3)(C).   Instead, Plaintiff included an un-numbered, nearly 20-page "statement of facts" section in her opposition brief.   The Rule is clear that this is an improper instrument and format by which to set out facts at summary judgment and is insufficient to put issues before the Court.   *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000).   In addition, Plaintiff's 20-page statement of facts far exceeds the "40 separately-numbered statements of additional facts" that the Rule permits.   See L.R. 56.1(b)(3)(C).   Finally, many of Plaintiff's facts contain no citation to the underlying record, in violation of part (b)(3)(B) of the Rule.

As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job . . . to make it easy for the court to rule in [her] client's favor . . . ." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006). Because Plaintiff's submissions on summary judgment miss the mark set out in Local Rule 56.1(b)(3)(c) by a wide margin, the Court will disregard the statement of facts contained in Plaintiff's memorandum in opposition to the Defendants' motions for summary judgment [84].

Defendant SomerCor argues that many of Plaintiff's responses to SomerCor's L.R. 56.1 Statement should be stricken because they violate the Rule by including facts and information that exceed the scope of an appropriate response. See *Prewitt v. U.S.*, 2012 WL 5381281, *1 (N.D. Ill. Oct. 31, 2012) ("District Courts are entitled to expect strict compliance with Local Rule 56.1" and "[w]hen a nonmovant fails to adhere to Local Rule 56.1(B), the Court may admit the movant's 56.1 Statement and disregard the nonmovant's submissions."). For example, one of SomerCor's undisputed facts states that "Howard's performance evaluation dated July 1, 2006, contained a supervisor comment which 'stressed better portfolio management' by Howard and encouraged her to 'continue to upgrade day to day servicing actions.'" SomerCor L.R. 56.1 Stmt ¶ 10. Rather than admit or deny the fact, Plaintiff responded: "Admitted. However, the evaluation reveals . . ." and then added new facts in an effort to provide context and supplement

the record.

The Court agrees with Defendant that some of Plaintiff's responses arguably go beyond what fairly can be considered responsive and would have been more appropriate to convey in Plaintiff's own L.R. 56.1 statement of up to 40 additional facts. But because Plaintiff achieved partial – and perhaps even substantial – compliance with this aspect of the Local Rule, the Court will exercise its discretion in the direction of leniency. Rather than analyzing each of the 39 responses with which Defendants take issue to determine which (and to what extent) the responses exceed the bounds of "responsiveness," the Court instead will consider the 39 replies to Plaintiff's responses that Defendant SomerCor has submitted to the Court in the event that Plaintiff's responses are not stricken. Although L.R. 56.1 does not permit replies, the Court is given wide latitude in interpreting and enforcing its local rules. See *Chichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005) ("We review a district court's decision concerning whether a litigant complied with a local rule, such as Local Rule 56.1, for an abuse of discretion."). The Seventh Circuit has been clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow . . . that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). "To the contrary, unless the district court 'enforces (or relax[es]) the rules unequally as between the parties,' the decision 'to overlook any transgression [of the local rules] is left to the district court's discretion." *Id.* (quoting *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011)). The Court concludes that admitting Defendant's replies [98] is the equitable result here, particularly because SomerCor has only replied to 39 of Plaintiff's responses, which is fewer than the number of responses to which SomerCor would have been entitled if Plaintiff had

complied strictly with L.R. 56.1 and appropriately submitted these 39 (arguably) additional facts in a separate document. Accordingly, the Court only has taken facts from SomerCor's Statement of Facts ("SomerCor SOF") [63], Inland's Statement of Facts ("Inland SOF") [75], Plaintiff's Response to Inland's Statement of Facts ("Pl. Response to Inland") [85], Plaintiff's Response to SomerCor's Statement of Facts ("Pl. Response to Inland") [86], and SomerCor's Reply to Plaintiff's Response to SomerCor's Statement of Facts [98].

With that said, it is still within the district court's discretion to strictly enforce compliance with Rule 56.1 within the universe of facts that the Court will consider here. See *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir. 2009); *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). As discussed above, merely including facts in a responsive memorandum is insufficient to put issues before the Court. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

In addition, Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). Where a party improperly

denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. Thus, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on the summary judgment motions. Any paragraph or fact that is not supported by record evidence will be disregarded.

**B.    Facts**

Plaintiff Crystal Howard ("Howard") is an African-American female. From March 2004 until her termination on September 11, 2009, Howard worked at SomerCor. SomerCor is a non-profit company that provides financing for small businesses. Although Howard was hired by (and worked at) SomerCor, she technically became an Inland employee in February 2005 when SomerCor and Inland entered into a contractual arrangement by which Inland provided all personnel and human resource services to SomerCor. Also in February 2005, Howard was promoted to director of portfolio management in SomerCor's loan servicing department, a role which included managing the department itself. Howard's supervisors were Mickey Maslic ("Maslic"), President of Inland, and David Frank ("Frank"), SomerCor's executive director.

In July 2006, Howard's performance evaluation "stressed better portfolio management," but noted that Frank, Howard's supervisor, was "very pleased with [Howard's] performance from the past year" and rated her "commendable." Howard received a pay increase at the time of the evaluation. Howard's evaluation the following year, conducted by Maslic in June 2007, noted that Howard should focus on "tak[ing] control of the department" and elevating the department's service to the highest level. Howard also received a pay increase with this evaluation. Howard's June 2008 performance evaluation included comments by Howard that

reflected her desire for a promotion to assistant vice president or vice president, which she previously had discussed with Maslic and would require approval by SomerCor's Board of Directors. Howard's evaluation rated her "proficient," and she received another pay increase.

In June 2008, SomerCor engaged The Preston Group, Inc. to conduct an independent audit of SomerCor's operations to help SomerCor prepare for an upcoming audit by the Small Business Administration. The Preston Group prepared a report of their findings, which outlined twenty-four recommendations for the improvement of each of SomerCor's departments, six of which concerned Howard's servicing department. Lisa Preston, the Preston Group's President, authored the report. According to Frank and Maslic, the Preston Group's findings convinced them that the servicing department needed an overhaul and that Howard, while still an asset to SomerCor, was not the right leader for that department.

On July 25, 2008, SomerCor's Board of Directors met and discussed, among other things, the Preston Group's report and Howard's promotion request. During the meeting, Frank told the Board that Lisa Preston had suggested to him that Howard be replaced as head of the servicing department. Frank expressed his agreement with Preston's recommendation, as well as his view that the Board should decline Howard's promotion request. As a result, the Board decided to put Howard's promotion on hold.

On August 29, 2008, Frank and Maslic met with a former SomerCor employee, African-American female Stephanie Day, over lunch in the hope of convincing Day to return to the company to manage the servicing department. Day previously had worked in SomerCor's servicing department, but resigned in 2004 when SomerCor's former president, Russel Lennich, hired Howard to replace her. Because of Day's familiarity with the department and the experience she had gained since leaving the company, Frank and Maslic offered Day the position

of senior vice president and portfolio manager on September 8, 2008. Day accepted the offer the next day, and the parties agreed that she would start the job on October 6, 2008.

On September 9, 2008, Howard called Myra Smith in the company's human resources department to lodge a complaint against Frank for sexual harassment and against both Frank and Maslic for racial and gender discrimination ("the September 2008 complaint"). Over the telephone, Smith advised Howard to submit a formal complaint to a different member of the human resources department, Barbara Rizzo. Howard submitted a written complaint to Rizzo that same day. In the complaint, Howard alleged that the company had discriminated against her by subjecting her promotion to the approval of the board of directors. According to Howard, white males, in the past, had been given promotions without the formal approval of the board.

According to Howard, this was not her first complaint to HR. Howard alleges that she first complained of sexual harassment to Myra Smith in May 2008, when she called Smith to report that Frank had asked her to spend the night with him in Las Vegas, prior to his departure for a business trip there. According to Howard, when Howard called Smith again to complain in September, Smith told her not to include that particular allegation in her written complaint to Rizzo; there was no need to re-allege it, because HR was already investigating it. Consequently, the September 2008 complaint made no mention of the sexual harassment complaint that Howard alleges to have made verbally to Smith. Smith denies that Howard called and complained to her in May 2008, and therefore, also denies telling Howard not to include a sexual harassment allegation in her memo to Rizzo. According to Smith, Howard's 2008 complaint was Howard's first and only complaint that Smith fielded.

On September 12, 2008, the human resources department contacted Howard to set up a time to discuss her complaint. Nora O'Connor, Inland's director of human resources, conducted

the investigation and met with Howard on September 17, 2008. O'Connor also interviewed Frank, Maslic, and Terry Boston, Howard's colleague and friend in the servicing department. The investigation "revealed that the Preston Audit opened Maslic and Frank's eyes regarding the Servicing Department." It also revealed that the white males about whose promotions Howard complained were differently-situated than Howard in that they were recent hires by the company, who received title changes but not pay increases, and who were not elevated to an officer title. On September 23, 2008, O'Connor concluded her investigation and informed Howard of her finding of "no discrimination."

The next day, September 24, 2008, Maslic informed Howard that Day had been hired as the servicing department's new manager and that Howard would be demoted (though her pay would not decrease). Upset at the news, Howard packed up a portion of the belongings in her office and brought them home. Maslic and Frank view this event as the first of many behavioral incidents that exemplified Howard's refusal to work cooperatively under Day and ultimately justified their decision to terminate Howard. According to Howard, she packed up her belongings not as a sign of protest or unwillingness to work as Day's subordinate, but because she believed that Day was hired in retaliation for her sexual harassment and discrimination complaints. Because Howard suspected that her termination may be looming, she wanted to take her heavier belongings home so that she did not have to carry them all on the train on her last day.

On October 16, 2008, Howard filed charges of sexual harassment and gender and race discrimination with the EEOC. Howard ultimately was fired from SomerCor on September 11, 2009. As discussed in greater detail below, Defendants maintain that Howard was fired because of poor job performance and an unwillingness to work agreeably under Day. Howard alleges

that Defendants fired her in retaliation for complaining about sexual harassment and discrimination.

As mentioned, Howard maintains that the September 2008 complaint was not her first sexual harassment and discrimination complaint to SomerCor's human resources department. Howard contends that she first reported these same issues via telephone to Myra Smith in May 2008, an event that Howard insists precipitated all of the negative consequences that followed – including the denial of her promotion request, Day's hiring, Howard's demotion, and, ultimately, Howard's termination. Howard alleges that Frank consistently sexually harassed her from January 2006 until September 2008. Specifically, Howard says that Frank made weekly "unwelcome comments" regarding Howard's appearance, spoke to her using sexual overtones, frequently rubbed her arm, would put his arm around her or hug her, and jokingly referred to Howard and the other women in the servicing department (Terry Boston and Nicole Haraway) as his "servicing girls." Although Howard never asked Frank to stop rubbing her arm, or hugging her, she says that she consistently pulled away from him when he would do it. According to Boston, at some point she and Howard expressed their opinion to Frank that his use of the term "servicing girls" was inappropriate, but he continued to use the term even after that conversation. Howard never asked Frank to stop making comments about her appearance. Howard contends that Frank had been sexually harassing her in this fashion since January 2006, but she says that it was Frank's insistence that Howard spend the night with him in his hotel room on a business trip to Las Vegas that prompted her finally to complain about any of it.

Defendants contest that Howard made this complaint to Smith in May 2008 ("the May 2008 complaint"). Smith testified at her deposition that the September 2008 complaint was the first and only complaint she ever received from Howard. However, Terry Boston testified at her

deposition that Boston witnessed (and was physically present in Howard's office when) Howard made the May 2008 call to Smith to complain about Frank's sexual harassment and racial and gender discrimination concerning the fact that her promotion to vice president would need Board approval.

Howard maintains that SomerCor refused to promote Howard, hired Day, demoted Howard as head of the servicing department, and ultimately fired Howard in retaliation for making the May 2008 complaint. Defendants dispute this contention and submit that Day was hired (and Howard was demoted) solely because the Preston report convinced Frank and Maslic that the servicing department needed new leadership, and that Howard was fired because of subpar work performance.

Despite Defendants' denials regarding the existence of the May 2008 complaint and the alleged retaliatory motives born therefrom, Stephanie Day's deposition testimony and affidavit provide substantial corroboration of Howard's allegations. According to Day, Frank and Maslic first tried to lure Day back to SomerCor to replace Howard in the summer of 2008, though she cannot seem to recall the exact date of their first communication with her. Following their call to Day, she met with Frank and Maslic over lunch to discuss the possibility of her return to SomerCor to run the servicing department. According to Day, at this lunch meeting both men were furious that Howard had complained about sexual harassment and race and gender discrimination. Though they also mentioned the poor audit results, Frank and Maslic made it clear to Day that they wanted Howard "gone" because she had complained. Day says she also met with Frank and Maslic a second time that summer to continue their discussion. Again, Day says, the men displayed anger over Howard's complaint of sexual harassment and gender and

race discrimination and expressed their desire to fire her as a consequence. Defendants and Howard agree that one of these lunches took place on August 29, 2008.

According to Defendants, Howard's work suffered tremendously once Day took over the servicing department on October 6, 2008. Day, Frank, and Maslic met with Day almost weekly to discuss Howard's performance-related issues during the entirety of Howard's tenure working under Day. A memorandum to Frank and Maslic, submitted by Day on July 30, 2009, ostensibly reflects Day's view that Howard was rebellious, a sub-standard employee, appeared to purposefully make errors in her work, and should be terminated. Day's affidavit and deposition testimony, however, reveal that she, Maslic, and Frank went to extraordinary lengths to create an environment where Howard could not succeed so that Maslic and Frank could create a paper trail that they could use to justify her termination. According to Day, Frank and Maslic required her to document each and every one of Howard's missteps, no matter how trivial or inconsequential. Day says that Howard's "performance-related" firing was a sham that she helped orchestrate so that Maslic and Frank could fire Howard in retaliation for Howard's harassment and discrimination complaints. According to Howard, Frank and Maslic refused to speak with her after she filed her complaint with the EEOC. She submits that she kept the EEOC investigator assigned to investigate her complaint, Shawn Hayes, abreast of the way in which Day, Frank, and Maslic treated her as their hostility towards her evolved and escalated, and that she relayed to Hayes her belief that Frank and Maslic had hired Day to ultimately terminate her. Among other things, Howard maintains that Day would give her an assignment, which she would complete as directed, only to have Day accuse her of failing to follow instructions. Further, Howard submits that Day and Frank falsified servicing department meeting minutes to include phantom comments that they attributed to Howard in order to make her look uncooperative or

rebellious. Day allegedly instituted a rule – which only applied to Howard – that Howard was not allowed to close the door to her office. Contrary to Defendants' assertions about her job performance, Howard maintains that – because she believed Day was hired to ultimately terminate her, and suspecting that she would be subject to heightened scrutiny – she actually worked harder and smarter than ever before.

On July 31, 2009, Frank and Maslic reported to SomerCor's Board of Directors that Howard was performing poorly. In late August, Frank and Maslic directed Day to terminate Howard, which she did on September 11, 2009. On November 12, 2009, Howard filed another complaint with the EEOC, alleging that SomerCor fired her in retaliation for her previous harassment and discrimination complaints.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* The Court must resolve all evidentiary conflicts in Plaintiff's favor and accord her the benefit of all reasonable inferences that may be drawn from the record. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2013). "It is not for the courts at summary judgment to weigh evidence or determine credibility of [a witness's] testimony." *Id.* (quoting *Berry v. Chicago Transit Auth.,* 618 F.3d 688, 691 (7th Cir. 2010). Nevertheless, summary judgment in favor of the defendant "is hardly unknown or, for that matter rare, in employment discrimination cases." *Wallace,* 103 F.3d at 1396.

## III.    Discussion

Plaintiff alleges that SomerCor and Inland committed four distinct violations of Title VII. Count I alleges gender and racial discrimination based on the fact that her promotion request required Board approval, even though several white males had been promoted in the past without the involvement of the Board. Count II alleges that Defendants retaliated against her for complaining about this discrimination and Frank's sexual harassment. Count III alleges sexual

harassment.  Count IV alleges that Frank, Maslic, and Day created a hostile work environment in retaliation for her internal and EEOC complaints.

## A.        Race and Gender Discrimination

Plaintiff alleges that Defendants violated Title VII by subjecting her promotion request to the approval of SomerCor's Board of Directors.  Because the company had promoted white males in the past without the Board's involvement, she believes that this prerequisite applied to her because she is a female and an African-American.  Title VII prohibits discrimination in employment:  "It shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof.  *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent.  *Id*.; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997).  In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination."  *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing

*Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)). A plaintiff may prevail under the direct method of proof by "constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005) (quoting *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).

Plaintiff has not identified any evidence to support a claim under the direct method of proof. Defendants did not admit or acknowledge any discriminatory intent, and Plaintiff devotes only the final paragraph of her 37-page opposition brief to her claim of racial and gender discrimination. In that lone paragraph, Plaintiff argues that:

> a jury may reasonably conclude that Frank and Maslic chose Day [to replace and ultimately fire Howard] because she is African American and, given that she had been replaced by Howard previously at SomerCor, may hold a grudge and do their bidding. The question one asks is why couldn't Frank or Maslic themselves terminate Howard. They hired an African American whom they thought would be compliant with their termination demand because it would not appear discriminatory.

Pl. Opp. Br. at 36-37. Although Plaintiff does not specify the method of proof (direct vs. indirect) by which she is attempting to establish gender and race discrimination, Plaintiff seems to be arguing that the hiring of an African-American female to fire another African-American female supports a reasonable inference that Frank and Maslic had (and were trying to conceal) a discriminatory motive for terminating Howard. The problem with this argument is that Howard does not allege that she was fired because of her race or gender. Rather, Howard alleges that Frank and Maslic discriminated against her by requiring Board approval before promoting her, despite the fact that white males who had been promoted in the past did not have to clear this hurdle. This is the first time that Plaintiff has tried to link her allegation of racial and gender discrimination to her termination. Previously, in fact, Plaintiff explicitly admitted that

Defendants did not want to terminate Howard because of her race or gender but because "she had brought sexual harassment charges against Frank."  Pl. Resp. to SomerCor 56.1 Stmt. ¶ 18.

Further, the record is void of evidence suggesting that Frank and Maslic actively sought to replace Howard with an African-American female generally, regardless of her qualifications, or that Day was unfit for the position.  To the contrary, the undisputed evidence reveals that Defendants hired Day because she had previously led SomerCor's servicing department and since had gained valuable outside experience at Banco Popular, and Plaintiff does not challenge Day's qualifications.  To the extent that Plaintiff alleges that Defendants hired Day as a reaction to Howard's HR complaint regarding race and gender discrimination (and sexual harassment), that allegation cannot support a claim for gender and race discrimination itself, but instead may support a Title VII retaliation claim, which Plaintiff has alleged in Count II.

Moreover, neither Plaintiff nor the other African-American females in the servicing department, all of whom were deposed, could point to a single instance of racial or gender discrimination that they witnessed at SomerCor.  Accordingly, Plaintiff falls far short of pointing to strong enough circumstantial evidence to support an inference that she was intentionally discriminated against on the basis of her race or gender.  Because Plaintiff has not put forth any direct evidence of discrimination, she must proceed under the indirect method.  See *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) ("A plaintiff may prove illegal discrimination either directly or indirectly.").

The indirect method is governed by the *McDonnell Douglas* burden-shifting framework, pursuant to which a plaintiff must present evidence tending to show that: (1) she is a member of a protected class; (2) she performed reasonably on the job in accord with his employer's reasonable expectations; (3) she suffered an adverse employment action; and (4) similarly

situated employees outside of her protected class were treated more favorably. 411 U.S. 792, 802-04 (1973); see also *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If she does so, then the burden shifts to the employer "to introduce a legitimate, nondiscriminatory reason for the employment action." *Naficy v. Ill. Dep't of Human Serv.*, 697 F.3d 504, 511 (7th Cir. 2012). If the employer meets that burden of production, then the burden shifts back to the plaintiff to provide evidence that the employer's reason was pretextual. *Id.* at 511–12.

Here, Plaintiff has failed to demonstrate that similarly situated employees outside of her protected class were treated more favorably. "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (internal citation omitted). "There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* "In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Id.* "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not have identical employment files." *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012).

Although Defendants admit that six white males at SomerCor have been promoted without board approval, Plaintiff has not demonstrated nearly enough commonalities to allow for a meaningful comparison to them. "In the usual case a plaintiff must at least know that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 846 (internal quotations omitted). Here, the record is devoid of any evidence (or allegation) that the white males at issue dealt with the same supervisor, were subject to the same standards, or performed similarly to defendant in their jobs at SomerCor. And what the record does reflect suggests that Plaintiff, in fact, was not similarly situated. First, Howard's deposition testimony reveals that none of the males had been promoted to Vice President. Second, all of the males had been promoted in prior years. (Howard does not specify when they were promoted, just that they were promoted in the past). Next, all of the men worked in different departments (presumably performing different tasks and under different supervisors.) Pl. Resp. to SomerCor 56.1 Stmt. ¶ 42. In fact, Plaintiff admitted in response to interrogatories that "her position and her job responsibilities were unique and did not identify any similarly situated non-African Americans or males who were treated more favorably than her." *Id.* ¶ 72. The small servicing department that Howard managed consisted of just three employees, Howard and two subordinates. Pl. Resp. to SomerCor 56.1 Stmt. ¶ 42. During the entire time that Howard worked at SomerCor, no one from the servicing department was promoted. SomerCor Reply to Pl. Resp. ¶ 42. Additionally, Plaintiff was one of the four highest paid employees in the company and made more money than all of the white males about whom she complained. *Id.* ¶ 41. Finally, the Preston audit significantly differentiates Howard from those promoted in prior years. Howard requested to be considered for a promotion during her performance evaluation on June 13, 2008. *Id.* ¶ 41. The Preston audit was scheduled to take place from June 16-20, 2008, and the Board meeting was scheduled for July 25, 2008. *Id.* ¶ 15. SomerCor commissioned the Preston audit because it learned that the Small Business Administration also was going to be conducting an audit. *Id.* ¶ 14. Without more information about the white males' job description and performance, this fact

alone prevents a meaningful comparison between Howard and anyone who had been promoted in prior years; in this particular year, outside evaluators were about to conduct an objective assessment of each department and manager and diagnose any deficiencies observed. It makes sense that SomerCor would want to delay promotion decisions until those audits took place and the results were studied. In fact, the record suggests that, with these audits looming, no promotions were made in the summer of 2008. In the end, we know the names of six white men from other departments who received promotions to jobs other than vice president without Board approval, but we know nothing else about them. Accordingly, the record does not contain nearly enough information to create a triable issue of fact in regard to whether Plaintiff and the white males about whom she complains were similarly situated.

Furthermore, even assuming that a meaningful comparison could be drawn between Plaintiff and the white males, the Preston Audit constitutes a legitimate nondiscriminatory reason for SomerCor's promotion decisions with respect to Howard. Howard formally made her promotion request at her yearly performance review on June 13, 2008. An outside auditor was scheduled to evaluate Howard, along with the rest of the company, just three days later. And the Board was scheduled to discuss the results of that audit the following month. In light of those circumstances, it was reasonable for Howard's supervisors to submit her request for the Board's consideration. And the Preston audit results provided SomerCor with ample justification for denying Howard's promotion to vice president. During the audit, the Preston Group observed that Howard lacked knowledge of SBA servicing requirements and lacked attention to detail and a sense of urgency, which resulted in non-compliance with certain SBA regulations. SomerCor Reply to Pl. Resp. ¶ 18. Consequently, Lisa Preston recommended to SomerCor that a more detail-oriented, hands-on leader in the servicing department was required to ensure compliance

with SBA regulations, and that the company consider sweeping personnel changes in the servicing department.  SomerCor Reply to Pl. Resp. ¶ 16.  Defendants, therefore, have met their burden of establishing a legitimate nondiscriminatory reason for its decisions regarding Howard's promotion request.  Plaintiff, however, is unable to point to any evidence that contradicts Lisa Preston's recommendation or suggests that SomerCor's purported justifications were pretextual.

In sum, Plaintiff has failed to introduce either direct or indirect evidence to create a triable issue as to whether SomerCor's decision to subject Howard's promotion to Board approval, or the denial of the promotion itself, was motivated by a discriminatory intent.  For the reasons discussed, the Court grants Defendants' motion for summary judgment as to Count I.

**B.      Retaliation**

Plaintiff alleges that Defendants violated Title VII by (1) declining to promote her to vice president, (2) demoting her to servicing analyst and hiring Day to replace her as head of the servicing department, and (3) ultimately firing her, all in retaliation for her complaints to the company's human resources department and the EEOC.  Because Defendants' position is that Plaintiff first complained on September 9, 2008 (and not in May 2008, as Plaintiff contends), Defendants argue that the decisions not to promote Howard and to hire Day as Howard's replacement could have not been retaliatory since Defendants made these decisions prior to her complaint.  And they argue that their decision to terminate Howard's employment was motivated solely by her unsatisfactory job performance and not at all by her complaints to HR or the EEOC.

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful

employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (internal quotations and citations omitted).

"Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Tomanovich*, 457 F.3d at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'" *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005)).

Defendants do not dispute that Howard's purported complaints to HR and the EEOC constitute protected activities, but argue that Plaintiff did not suffer any adverse employment actions and that, if she did, there was no causal link between the two. Defendants' (inexplicable) argument that the denial of Plaintiff's promotion, her demotion, and eventual termination do not

constitute adverse employment actions is untenable. An action is adverse for the purposes of Title VII retaliation "if it might dissuade a reasonable worker from making or supporting a charge of discrimination," (*Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th 2012)), and the actions taken against Howard surely would. Whether causation exists – *i.e.,* whether a retaliatory animus motivated the Defendants' adverse actions – is the real issue here. *Id.*

This case presents one of those rare instances where a Plaintiff has come forward with direct evidence of Title VII retaliation. See *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) ("Because direct evidence essentially requires an admission by the employer, such evidence is rare.") (internal citations omitted). In both Stephanie Day's deposition and her affidavit, she testified that she met Frank and Maslic over lunch in the summer of 2008 to discuss the possibility of her returning to SomerCor and that they met for lunch a second time to continue the discussion. At the first lunch with Frank and Maslic, according to Day's affidavit, "Frank said that [Howard] made a complaint of sexual harassment and discrimination" and "told [Day] very emphatically that Crystal Howard had to go." Day is uncertain as to the exact dates of the lunches (though she testified that both took place prior to her receiving or accepting a formal offer of employment), but Plaintiff and Defendants agree that Day, Maslic, and Frank met for lunch on August 29, 2008. Her testimony therefore gives credence to the notion that Frank and Maslic were aware that Howard had made a complaint of sexual harassment and discrimination prior to September 9, 2008 (which Defendants contend was the date of Howard's first complaint) and supports Howard's own testimony that she first complained to Myra Smith in May 2008.

Further corroborating Howard's retaliation claim is the testimony of Howard's colleague Terry Boston. Boston testified at her deposition that she was present in Howard's office when Howard called Myra Smith and complained about sexual harassment and gender and race discrimination. SomerCor Reply to Pl. Resp. ¶ 35. SomerCor points to Boston's deposition testimony in which she said that although she could not recall the exact date on which she witnessed Howard call Smith, this call occurred either immediately before or after "that time that [Howard] was off on sick leave." Defendants argue that Howard took medical leave in February or March 2009, and so the call to Smith that Boston witnessed must have occurred around that time. Yet Defendants have put forth no evidence that Smith received a call from Howard during that timeframe, so this may or may not be the "sick leave" to which Boston was referring. The Court is not permitted to weigh the evidence at this juncture, but must determine whether a genuine issue exists regarding material facts. Myra Smith says that Howard only complained to her once, on September 9, 2008. Howard says she first called Smith in May 2008. Boston claims to have witnessed two calls to Smith, and Day's testimony regarding Frank and Maslic's knowledge of a complaint in the summer of 2008 supports Howard's contention that she first called Smith in May. In light of this disputed testimony, the Court concludes that a reasonable jury could conclude that Howard first complained about sexual harassment and discrimination to Smith in May 2008.

No matter when Howard first complained, Defendants argue that causation is still not a material issue for trial, in light of the but-for causation standard that governs Title VII retaliation claims. See *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013) ("[T]he Court now concludes as follows: Title VII retaliation claims must be proved according to traditional principles of but-for causation."). "This requires proof that the unlawful

retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* Defendants argue that, in light of the evidence of Howard's sub-par work performance (namely, the results of the Preston audit, which preceded Day's hiring and Howard's demotion, and Day's July 2009 memo delineating the bases for her recommendation to terminate Howard), a reasonable jury could not find that Howard's complaints were a but-for cause of the Defendants adverse employment actions. The Court disagrees.

Although Defendants' evidence establishes the existence of a genuine, triable dispute over the cause of its actions (*i.e.,* Defendants' motives), a reasonable jury viewing the evidence as a whole could find the but-for cause of Defendants' actions to be retaliatory animus. At her deposition, Day testified that during her first lunch with Frank and Day, "[t]hey said that Crystal had filed a complaint, that she had also alleged that David had sexually harassed her, and that they wanted her gone." Day Dep. at 40. Day testified that Frank and Maslic "also said that [Howard] wasn't doing a good job in servicing . . . and that her whole team was not performing," *id.* at 40-41, but that her poor performance was a "guise" and that once she started at SomerCor she saw that Frank and Maslic's reason for wanting to fire Howard "was more she filed these charges than she's not performing." *Id.* at 41. In Day's affidavit, she testified that "[she] can say with absolute certainty, based on what [Frank and Maslic] said [at lunch in the summer of 2008] and their tone, that they wanted Crystal 'gone' because she had reported sexual harassment and discrimination first and foremost." Day Aff. at 1. Further, she testified that Frank and Maslic made clear to her that "Crystal's having reported the sexual harassment and discrimination . . . was the principal reason [Frank and Maslic] were so angry and wanted her 'gone' from SomerCor." *Id.* at 2. At her deposition and in her affidavit, Day described her part in the termination effort. See Day Aff. at 2; Day Dep. at 46-54. In Day's affidavit, she testified that:

from the moment I returned to SomerCor, it was clear that I was expected to be part of an effort to drive Crystal from her job. [Frank and Maslic] wanted me to meet with Crystal . . . constantly and to document each and every thing she failed to do no matter how trivial. I was to report everything to them and also to Nora O'Connor, Inland's Human Resource Director. In fact, I was to have regular meetings with [Frank and Maslic] and Ms. O'Connor concerning Crystal's performance. This all was an effort to lay the groundwork for firing Crystal and it was extraordinary with the constant documentation of every little thing that could be found that might be a problem with her work and the constant involvement of Nora O'Connor in that effort. They wanted Crystal gone and it was obvious to me that I was hired to help them do that.

Day Aff. at 2. By September 2009, Day could "see the kind of environment [Frank and Maslic] had created for [Howard] and knew . . . [she] was hired to . . . create some kind of paper trail that would lead to her firing and make it look like it was performance-related." *Id.* at 3. Additionally, as Day "continued to work at SomerCor, it became more and more obvious to [Day] that the idea Crystal didn't know what she was doing or somehow had been responsible for problems in our department was ridiculous and that both [Frank and Maslic] knew that." *Id.* In fact, Day testified that she unsuccessfully attempted to blow the whistle on the entire charade in July 2009 and prevent Howard's termination by reporting Frank and Maslic both to human resources and Catherine Chapman, the company's lawyer. *Id.*; see also Day Dep. at 54-56. In the end, "it was obvious to [Day] that Crystal's discrimination allegations were not the chief reason [Frank and Maslic] wanted her gone, it was the sole reason." *Id.*

The testimony in Day's deposition and affidavit, therefore, is direct evidence by one of Howard's superiors that she, Frank, and Maslic took action leading to Howard's firing because Howard had complained of sexual harassment and discrimination. Day's affidavit incorporates admissions by Frank and Maslic that their decisions to demote Howard and hire Day were retaliatory in nature. Defendants urge the Court to discount the "self-serving" testimony of Day, since her affidavit was created in response to Defendants' 56.1 statements and (presumably)

because, subsequent to Howard's dismissal, Day herself complained of discrimination, was fired from SomerCor, and brought a Title VII retaliation suit against the same defendants. But Day's deposition testimony is consistent with her affidavit, which is largely duplicative. And besides, it is not for the Court to assess credibility or weigh the evidence at summary judgment. That is the job of the factfinder at trial with the aid of tools of the adversary process such as cross-examination. See *Berry*, 618 F.3d at 691. At this stage of the litigation, the Court examines the evidence it has before it and asks whether a genuine issue of material fact exists, such that a reasonable jury could find for the Plaintiff. Having answered that question in the affirmative with respect to Plaintiff's Title VII retaliation claim, the Court denies Defendants' motion for summary judgment as to Count II.

### C.    Sexual Harassment

For Plaintiff's claim of sexual harassment to survive summary judgment, Plaintiff must show that there is a material dispute about whether: (1) her work environment was objectively and subjectively offensive; (2) the harassment was based on her sex; (3) the harassment was "sufficiently severe or pervasive to have altered the conditions of her employment such that it created an abusive work environment"; and (4) there is a basis for employer liability. *Passananti v. Cook County*, 689 F.3d 655, 664, 667 (7th Cir. 2012). In determining whether the harassment rose to a level that altered the conditions of employment and created an abusive working environment, "we consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012) (quoting *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001)). As the

Seventh Circuit has explained, it can be difficult to determine when sexual harassment is actionable under Title VII:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. We spoke in [*Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1010 (7th Cir. 1994)] of 'the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing.' It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other * * * .

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (internal citations omitted).

In determining on which side of the line a particular case falls – that is, to assess the frequency, severity, offensiveness, threatening and humiliating nature of the conduct at issue, and whether it unreasonably interferes with an employee's work performance – the specific facts obviously matter a great deal. In some cases, comments may tend towards the offensive but are not frequent enough to constitute harassment. See *Patt v. Family Health Sys., Inc.,* 280 F.3d 749, 754 (7th Cir. 2002) (holding that a female nurse had no sexual harassment claim based on a few comments by her boss to the tune of "the only valuable thing to a woman is that she has breasts and a vagina," because the comments were too isolated and sporadic to constitute pervasive harassment). In other cases, the comments may be more frequent, but not severe enough to alter the plaintiff's employment conditions. See *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 977 (7th Cir. 2000) (concluding that comments over the course of six months about a female employee's shoes ("I prefer to see you in shoes with your toes out'"), lingerie ("Well, can I see some pictures of you in some of the outfits that you have bought from Frederick's of Hollywood?"), and wardrobe generally ("What's your color for next week?" and "Do all of your clothes correspond?") were not severe enough to alter the conditions of the

plaintiff's employment).  And even when the complained-of conduct includes physical touching, there may not be actionable harassment.  See *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (determining that plaintiff had no sexual harassment claim based on her supervisor placing his hand on plaintiff's shoulder several times, asking her out on dates, putting "I love you" signs in her work area, calling her a "dumb blond," and attempting to kiss her in a bar).  But other times, unwelcome touching coupled with offensive sexually-based remarks can cross the line into sexual harassment territory.  See *Jackson v. County of Racine*, 474 F.3d 493, 500 (7th Cir. 2007) (holding that plaintiffs' accusations that their boss regularly touched them on the hair and back of the neck whenever he had occasion to interact with them, coupled with the offensive actions of simulating masturbation, sticking his finger in one of their ears, and kissing one of the plaintiffs on her lips, could show pervasive harassing conduct).  And in some cases, comments alone can support a sexual harassment claim.  See *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786, 788 (7th Cir. 2007) (determining that "eighteen sexist or sexual comments," which included telling plaintiff (who was bent over in the course of her work) to remain in that position because it was perfect, asking her if she got a breast enlargement over the weekend, and asking her "what business she had getting pregnant at her age" when he found out that she had recently miscarried, were severe and pervasive enough to constitute sexual harassment, even in the absence of unwelcome sexual advances or physical conduct).  The cases highlight the fact-intensive nature of the Court's task of determining whether a defendant's conduct is severe and/or pervasive enough to have altered a plaintiff's employment conditions. To do so requires close examination of the conduct itself.

Combing the Local Rule 56.1 Statements and the cited portions of the deposition transcripts, most of Howard's allegations are too vague for the Court to deem the complained-of

conduct actionable under Title VII. Howard complains that Frank made "unwelcome comments" to her several times a week from January 2006 through September 9, 2008. Howard Dep. at 14, 72. When asked at her deposition exactly what she meant by "unwelcome comments," Howard specified that the comments were in regard "to my appearance. The clothes I would wear," (*id.*) and that Frank's "voice was of a sexual tone." *Id.* at 73. Plaintiff provided just two examples of the comments that Frank would make. The first is a comment that Frank made upon Howard's return to the office after an off-site meeting. Frank said: "Wow. Is that what you had on all day? You look good." *Id.* at 73. Second, Howard alleges that Frank referred to Howard and the other women in the loan servicing department as "the servicing girls" "whenever he walked by [their] offices." *Id.* at 87-88. These comments (particularly the latter example), though sophomoric, annoying, and unprofessional, cannot support a claim for hostile work environment. One needs to look no further than the conduct described in the Seventh Circuit cases cited above to conclude that these comments are not severe enough to have created an abusive environment and sufficiently altered the conditions of plaintiff's employment.

But Howard complains about more than just Frank's immature comments, testifying also that Frank often "rubb[ed] [her] arm." *Id.* at 15. Howard specified that "If I was within arm reach of him, he would say 'How you doing today?' or, 'What's going on?' You know, ask me how my day was going, but he'd rub my arm, and I would kinda step away so I wouldn't be close enough for him to do that." *Id.* Howard provided no more specificity than that, leaving the Court with no information regarding precisely where on her arm Frank would touch her, what exactly she meant that he "rubbed" her, or for how long each of these "rubs" took place. In terms of frequency, Howard testified that Frank did this "often . . . I'm sure it wouldn't be less than 50 [times]." *Id.* at 15-16. And in addition to the arm rubbing, Plaintiff testified that Frank

would sometimes "reach to hug me," but that she would "pull away from his hug" so that she "would not be in his arms."  *Id.* at 19-20.

Like her description of Frank's comments, Howard's characterization regarding the nature of Frank's physical conduct is too nebulous or too innocuous for the Court to conclude that it was objectively offensive.  And the fact that Plaintiff never once asked Frank to stop these behaviors over the nearly two-and-a-half-year span in which they allegedly occurred, (Howard Dep. at 19, 72), leaves the Court skeptical as to whether Frank's conduct was subjectively offensive to Plaintiff.  Regardless, the conduct about which Howard complains is either too vague and/or ambiguous for the Court to conclude that Frank's conduct objectively crossed the line from "unpleasant working environment into hostile and deeply repugnant."  See *Baskerville*, 50 F.3d at 430-31.

In one instance, though, Howard's allegation is fairly specific.  Howard testified that in May 2008 Frank asked her to "spend the night with him in Las Vegas."  Howard Dep. at 76-78, 152.  It appears that Frank asked Howard this at SomerCor's office, prior to his departure for a business trip to Las Vegas.  *Id.*  Because Howard was not scheduled to take this trip, she believed that Frank was asking her to come on the trip with him and spend the night in his hotel room.  *Id.* at 77.  According to Howard, when Frank first asked her the question, she did not respond because it caught her off guard.  When he repeated it, Howard said, "No. That would not happen," and Frank never mentioned it again.  *Id.* at 77.  But Frank's isolated request, while brash and offensive if unwelcomed, was not pervasive, severe, threatening, or humiliating enough to create a hostile work environment.  *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473 (7th Cir. 1996), the most factually analogous case found by the Court, supports this conclusion.  In *McKenzie*, the plaintiff's boss made not one, but three, sexually suggestive comments that

could be construed as come-ons, the most offensive of which was "that he had heard that drinking coffee induces sexual arousal and, because he was coming over to her office, wanted to know if she was drinking coffee." *Id.* at 477. The Seventh Circuit concluded that, although the "comments were most certainly offensive," "the frequency or severity of the comments [did not rise] to the level of 'unreasonably interfer[ing] with [plaintiff's] working environment." In light of *McKenzie*, and Howard's inability to cite a single case where a court deemed conduct similar to Frank's to be actionable under Title VII, the Court concludes that Frank's request did not create an objectively hostile working environment.

Viewing Plaintiff's sexual harassment allegations as a whole, the complained-of conduct is either too vague, too infrequent, or too innocuous to rise to a level that altered the conditions of her employment and created an abusive working environment. Though Frank's conduct may have been obnoxious and unprofessional, in light of the evidence in the record, no reasonable jury could conclude that he subjected Plaintiff to a hostile work environment in violation of Title VII.

### D.     Hostile Work Environment

Howard brings a hostile work environment claim, separate and distinct from her sexual harassment claim, seemingly based on the working conditions that Frank, Maslic, and Day imposed on her once Day became her boss in October 2008. In Count IV of her amended complaint, Plaintiff alleges that Defendants "through the company's managers, subjected [her] to a hostile work environment as a result of the discriminatory conduct referenced above, including her participation in EEO activities and/or her opposition to her discriminatory, unlawful conduct." Amend. Compl. ¶ 24. Count IV is almost identical to Plaintiff's retaliation claim in Count II, in which Plaintiff alleges that Defendants, "through their managers, subjected [her] to

retaliatory conduct . . . insofar as the actions taken against her, including those referenced above, resulted from her participation in the EEO process and/or her opposition to her managers' discriminatory practice."

To the extent that Plaintiff is alleging that Defendants subjected her to adverse treatment in retaliation for complaints to HR and the EEOC, the Court has already determined that a triable issue exists and denied Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim in Count II. To the extent that Plaintiff is alleging that Defendants discriminated against her based on her race or gender, the Court already decided this and granted summary judgment for Defendants as to Count I. And to the extent that Plaintiff is complaining about the unreasonable and unfair demands that Day placed on her at Frank and Maslic's command, irrespective of any discrimination claim, that allegation cannot support a claim under Title VII. Title VII prohibits employment discrimination based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Plaintiff's claims concerning abusive or hostile working conditions generally, if unrelated to claims of discrimination, are not actionable under Title VII. And to the extent that these claims are based on underlying discrimination, the Court has determined those issues in Counts I, II, and III. Accordingly, Plaintiff has not stated a hostile work environment claim, and the Court grants Defendants' summary judgment motions as to Count IV.

Defendants argue that Howard may not make any allegations related to her working conditions under Day's supervision (including, presumably, with respect to her retaliation claim in Count II), because she did not make a hostile work environment charge in her EEOC complaint. "Under Title VII, a plaintiff is required to exhaust her administrative remedies by filing a complaint with the appropriate federal or state agency." *Dandy v. United Parcel Service,*

*Inc.*, 388 F.3d 263, 270 (7th Cir. 2004). Therefore, Courts review "solely those charges 'included in the EEOC charge . . . or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001). But exhaustion is not an issue here, because Plaintiff alleged retaliation in both EEOC complaints. Although she did not explicitly complain about the day-to-day hassling she allegedly received from Day, Frank, and Maslic, these allegations reasonably relate to and grow out of Plaintiff's retaliation claims. Indeed, in the wake of Howard's initial EEOC complaint, which she made on October 16, 2008, she met with the EEOC investigator, Shawn Hayes, on numerous occasions and kept him abreast of these developments as they unfolded in real time. And in Defendants December 15, 2009 letter to Investigator Hayes in which they formally responded to Howard's EEOC allegations, Defendants addressed the exact disciplinary measures taken by Day that Howard alleges were pretextual and retaliatory. See Letter to EEOC Dec. 15, 2009 at 2 (Ex. X to [63]). Accordingly, the Court rejects Defendants' argument that Plaintiff may not pursue her allegations related to the working conditions to which she was subjected under Day's supervision. To the extent that these allegations relate to her retaliation claim in Count II, the sole Count on which Plaintiff may proceed to trial, Plaintiff is free to do so.

## IV.  Conclusion

For the reasons stated above, the Court grants Defendants' motions for summary judgment [62, 73] with respect to Counts I, III, and IV and denies Defendants' motions with respect to Count II.

Dated: March 26, 2014

Robert M. Dow, Jr.
United States District Judge